IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


- - - - - - - - - - - - - - - x
IN RE:                           :
                                 :
BICOASTAL HOLDING COMPANY        :   Case No. 08-17648-8P7
                                 :        Chapter 7
              Debtor             :
                                 :
- - - - - - - - - - - - - - - x


                                    U.S. Courthouse
                                    801 N. Florida Avenue
                                    Tampa, Florida
                                    January 29, 2009
                                    10:40 A.M.


**E X C E R P T**

**FINAL EVIDENTIARY HEARING**

**Testimony of David E. Hammer, Esquire**

**Testimony of Douglas N. Menchise, Esquire**
**(Chapter 7 Trustee)**

Debtor's Motion to Dismiss Involuntary Petition
as filed in Bad Faith and for Costs,
Attorneys' Fees, Damages and
Punitive Damages (Doc. #16).


B E F O R E:   THE HONORABLE ALEXANDER L. PASKAY, Judge


_____

**JOHNSON TRANSCRIPTION SERVICE**
7702 Lake Cypress Drive
Odessa, Florida  33556
(813) 920-1466

2

A P P E A R A N C E S:

On Behalf of the Debtor:          GEOFFREY TODD HODGES, Esquire
                                  Attorney at Law
                                  905 Shaded Water Way
                                  Lutz, Florida  33549
                                  (813) 933-6571
                                  thodges@erniehakeford.com

On Behalf of Petitioning
Creditor Haircut Partners,
LLLP:                             DAVID E. HAMMER, Esquire
                                  David E. Hammer, P.A.
                                  212 Crystal Grove Boulevard
                                  Lutz, Florida  33548
                                  (813) 274-4999
                                  mail@davidhammeresq.com

Also Present:                     Douglas Menchise, Trustee
                                  Ernest B. Haire, III

3

## INDEX OF WITNESSES
### (Partial List for this Excerpt only)

**David Hammer, Esquire**

Page

Direct examination by Mr. Hodges                5

**Douglas Menchise, Esquire**

Direct examination by Mr. Hodges                56
Cross-examination by Mr. Hammer                 79
Redirect examination by Mr. Hodges              89

**Rebuttal Examination**
**David Hammer, Esquire**

Narrative/Direct Examination by Mr. Hammer
      90
Cross-examination by Mr. Hodges                 94

4

## INDEX OF EXHIBITS
### (Partial List for this Excerpt only)

Debtor's Exhibits                                    Admitted

No. 1    Assignment between Bleakley and Haircut    60

No. 4    State Court complaint in Haircut vs.       12
            Bicoastal.

No. 5    Faxed of State Court Amended Complaint     23
            except last page.

No. 6    Plaintiff's motion for summary judgment    30
            in State Court case.

No. 18   Composite of 1/2/09 letter from            52
            Mr. Hodges to Mr. Hammer with a
            printout of an e-mail.

* * * * *

Petitioning Creditor's Exhibits
                    Admitted

No. 1    Receipt ending in 345.                     94

No. 2    Receipt ending in 347.                     94

5

**E X C E R P T**

MR. HODGES:  I call David Hammer.

Whereupon,

**DAVID HAMMER**

was called as a witness and, having been duly sworn to tell the truth, testified herein.

MR. HODGES:  Good morning, Mr. Hammer.

MR. HAMMER:  Good morning, Mr. Hodges.

Your Honor, before we proceed if I could ask as a procedural matter, shall I make objections and argument here from the witness stand seeing as opposing counsel is calling me as a witness?

THE COURT:  Yes.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  You don't have to come and go back and forth.  Go ahead.

MR. HODGES:  Okay.

**DIRECT EXAMINATION**

BY MR. HODGES:

Q   Mr. Hammer, I would like you to open the white notebook you see before you.  That is the Debtor's exhibit notebook.  And if you would turn to Exhibit 5, please.  Do you recognize that document, Mr. Hammer?

A   (No response.)

Q   I'm sorry.  Exhibit 4.

6

THE COURT:  4 or 5?

MR. HODGES:  4.  I apologize, Your Honor.

THE WITNESS:  Yes, sir.

BY MR. HODGES:

Q    What is that document, Mr. Hammer?

A    This document appears to be a copy of a complaint filed in the matter of Haircut Partners, LLLP vs. Bicoastal Holding Company filed in the Circuit Court of the Thirteenth Judicial Circuit in and for Hillsborough County, Florida in the general civil division.

Q    And who signed that complaint on behalf of Haircut Partners?

A    It appears that Dan Bilzerian signed the complaint.

Q    Did you prepare this complaint for Mr. Dan Bilzerian to sign?

THE WITNESS:  Objection.  Attorney-client privilege.

THE COURT:  That's not a communication. That's not asking communication.

THE WITNESS:  If I prepare a document for a client --

THE COURT:  Yeah.  That's subject to answer. You have to answer it.

THE WITNESS:  Your Honor, if I --

7

THE COURT:  The privilege is limited to communication between the attorney and the client.  He didn't ask what he told you, he didn't ask what you told him, what advise you gave him.  The fact is did you sign [sic] the document.  That's all.

MR. HODGES:  Did he prepare the document.

THE COURT:  Prepare.

THE WITNESS:  No.

BY MR. HODGES:

Q    You did not prepare the document?

A    No.

Q    Do you know who did?

A    No.

Q    What role, if any, did you have in the preparation of this document?

THE WITNESS:  Your Honor, before I answer this question I would like to assert an objection.  And that is that Your Honor directed Mr. Hodges to put on some evidence that the Caligula claim is subject to dispute.  This is a state court lawsuit pending in state court.  This lawsuit is not necessary in any way to prove the Caligula claim.  If this lawsuit had never been filed, Caligula could have just as easily, or Haircut as the assignee of Caligula's claim, filed the involuntary against Bicoastal.  What does this have to

8

do with --

THE COURT:  Let's not argue -- come on.

THE WITNESS:  What does this have to do with anything?

THE COURT:  In what respect this is relevant when the suit was filed by Caligula, breach of contract, two-count complaint, against Bicoastal?

MR. HODGES:  It was filed by --

THE COURT:  That's relevant.

MR. HODGES:  It was filed by Haircut, Your Honor.

THE COURT:  Yeah.

MR. HODGES:  It was filed by Haircut.

THE COURT:  Haircut.  Yeah.

MR. HODGES:  It's the basis of Haircut's claim.

THE COURT:  All right.  Count III, breach of contract was alleged to have valid and binding notes of Bicoastal, owed money to Caligula.

MR. HODGES:  There are three counts, Your Honor, yes.

THE COURT:  Yes.  And Count III is relevant because Haircut asserted in the state court that this Debtor owes $16,000 to Haircut.

MR. HODGES:  Haircut asserted that this

Debtor --

THE COURT:  Correct.

MR. HODGES:  -- owes over 100,000 to Haircut.

THE COURT:  No.  Count III talks about sixteen thousand four sixty-eight sixty-seven.

MR. HODGES:  Yes, Your Honor.

THE COURT:  Correct.  Count III is relevant. That's all right.

MR. HODGES:  Your Honor, all three counts are disputed according to Mr. Hammer.

THE COURT:  Let's not -- take it one at a time and piecemeal because it's utterly -- we're just wasting time on everything.  You offered it in evidence, he stated an objection.  I overrule his objection and admit into evidence Exhibit 4.  And Exhibit 4 states what's in it.

The next question was his participation in drafting it.  He denied he had anything to do with it.

MR. HODGES:  He denied drafting it.

THE COURT:  Correct.

MR. HODGES:  I'm asking what role he had, if any, in the preparation of it.

THE COURT:  He had none.

MR. HODGES:  Pardon?

THE WITNESS:  I do not recall if I had any

10

role in preparing this document.

BY MR. HODGES:

Q    You don't recall.  Are you a partner in Haircut Partners, Mr. Hammer?

A    No.

Q    Actually, is your P.A. a partner in Haircut Partners?

A    Yes.  David E. Hammer, P.A. is a limited partner of Haircut Partners, LLLP.

Q    And what is David E. Hammer, P.A.'s limited partnership interest percentage in Haircut Partners?

THE COURT:  Whose is it?

MR. HODGES:  What is his ownership percentage in Haircut Partners?

THE COURT:  Hammer's?

MR. HODGES:  Yes.

THE COURT:  Yes.  100 percent?

THE WITNESS:  I don't know.

BY MR. HODGES:

Q    Is it greater than 50 percent?

A    I don't know.

Q    You don't know.  Are you the lawyer for Haircut Partners?

A    I represent Haircut Partners in the proceeding captioned in Exhibit 4.

11

Q    Does Haircut Partners --

THE COURT:  Were you instrumental in forming that partnership?

THE WITNESS:  I'm sorry?

THE COURT:  Were you instrumental in creating that partnership?

THE WITNESS:  I was one of the partners who formed it, yes.

THE COURT:  Correct.  But you don't know what percentage you own?

THE WITNESS:  That's correct.

BY MR. HODGES:

Q    You don't even know if it's above or below 50 percent is your --

A    That's correct.

Q    That's your testimony here today?

A    That's correct.

Q    Is Mr. Bleakley a partner in Haircut Partners?

A    No.

Q    Is his law firm?

A    No.

Q    And he assigned his law firm's claim to Haircut Partners; correct?

A    That is correct.

Q    In exchange for a limited and preferred return?

12

A    I don't understand your question.  Would you please repeat it and clarify it?

Q    What was the consideration for Mr. Bleakley's assignment?

A    A debt interest in Haircut Partners.  In other words, the Bleakley Law Firm is a creditor of Haircut Partners, LLLP, not an equity interest holder.

Q    Well, let's turn to Exhibit 5, if you would, Mr. Hammer.  Do you recognize that document?

THE COURT:  4 is admitted in evidence.

MR. HODGES:  Thank you, Your Honor.

**(Whereupon, Debtor's Exhibit 4,**

**previously marked for identification, was admitted**

**into evidence.)**

THE WITNESS:  This appears to be a document that was faxed twice -- apparently twice to the same fax number.

BY MR. HODGES:

Q    Do you recognize the document, Mr. Hammer?

A    I recognize some of the text contained within the document.  I don't recognize the document itself, no.

Q    You don't recognize the document?  You don't recognize this as the amended complaint filed in the Haircut Partners state court lawsuit?

A    I recognize this is what appears to be a

13

twice-transmitted facsimile of --

THE COURT:  Let's not beat the bird -- the bush.  Is that an amended complaint that was filed in the state court filed by you?

THE WITNESS:  (No response.)

THE COURT:  It's a two-page document.  Why do you have to read the whole book?

THE WITNESS:  Your Honor, this is not a two-page document.

THE COURT:  It is a two-page document.

THE WITNESS:  This is a one, two, three, four --

THE COURT:  Amended -- what I have in my book, 5, the amended complaint consists of a two-page document setting forth three distinct claims in three separate counts.

MR. HODGES:  With attachments.

THE COURT:  What?

MR. HODGES:  With attachments.

THE COURT:  I don't know the attachments.

THE WITNESS:  Could I approach, Your Honor, and give Your Honor this book?  Because this book doesn't sound like it's the same as your book.

THE COURT:  I have attachments.

THE WITNESS:  Okay.  I'm going to count the

14

number of pages that I have in Tab 5.

THE COURT:  The complaint itself is a three-page document.

THE WITNESS:  The complaint itself is a five-page document, including the certificate of service without any exhibits.

THE COURT:  Five pages?

THE WITNESS:  The amended complaint --

THE COURT:  Amended complaint.

THE WITNESS:  -- starting at Tab 5 --

THE COURT:  Tab 5.

THE WITNESS:  -- is a five-page document.

THE COURT:  Breach of contract, number 1?

THE WITNESS:  Yes.  At the bottom of page 1.

THE COURT:  All right.  Bottom of page 2 is Count II, breach of contract?

THE WITNESS:  Yes.

THE COURT:  Count III, breach of contract?

THE WITNESS:  On page 3.

THE COURT:  Yes.  Okay.  And the "wherefore" clause is page 4.

THE WITNESS:  Yes.  And then a certificate of service on page 5.

THE COURT:  The body of the document we're talking about, not the service of the complaint.

15

THE WITNESS:  Okay.  Without the certificate of service the document is four pages.

THE COURT:  That's a page, the certificate of service.

THE WITNESS:  That is a page.  If you don't count --

THE COURT:  The body of the document, the amended complaint which is filed in the state court litigation.

THE WITNESS:  Is four pages, plus one page for the certificate of service, plus one, two, three --

THE COURT:  Don't count -- don't ask for that.

THE WITNESS:  Okay.

THE COURT:  All right.  Okay.  Go ahead.

BY MR. HODGES:

Q    Do you recognize the document, Mr. Hammer?

A    I recognize the text of this document.

THE COURT:  Correct.

BY MR. HODGES:

Q    Do you recognize it as a copy of the amended complaint in the Haircut state court litigation, Mr. Hammer?

A    Yes.

Q    Okay.  Exhibit 1 to that amended complaint, does that appear to be a true and correct copy of the assignment

16

of fees from the Bleakley Law Firm to Haircut Partners?

A    Your Honor, if I may, I thought we were talking about the Caligula claim.  That's Exhibit 3.

THE COURT:  He challenged all three of them.  So, he can -- assignment of the claims.  All right.

THE WITNESS:  Exhibit 3 to the amended complaint --

BY MR. HODGES:

Q    Mr. Hammer, I asked you about Exhibit 1.

A    -- refers to Caligula.

THE COURT:  Exhibit 1.

THE WITNESS:  Yes, Your Honor.

THE COURT:  Assignment between Bleakley Law Firm and Haircut Partners, dated as of May 11, 2008.

THE WITNESS:  Yes, Your Honor.

THE COURT:  That was part of the amended complaint in the state court.

THE WITNESS:  Yes, Your Honor.

THE COURT:  All right.

BY MR. HODGES:

Q    And paragraph 2 of that assignment reflects that any payment to Mr. Bleakley or his law firm is contingent upon recovery; is that not right?

A    Perhaps I didn't understand your question.  Would you rephrase?

17

Q   Paragraph 2 of the assignment --

A   Yes.

Q   -- please read --

THE COURT:  Paragraph 2 on the bottom.

THE WITNESS:  Okay.

BY MR. HODGES:

Q   Have you read that paragraph?

A   I have.

Q   Did you draft this assignment, by the way?

A   No, I did not.

Q   Did you draft any of the assignments?

A   I may have drafted mine; I may have drafted Caligula's.  I don't remember.  But I know I definitely didn't draft this.

Q   Yours and Caligula's are identical, correct, except for the names and the amounts?

A   Well, I can look at them and determine that, if you would like.  Would you like me to do that now, Mr. Hodges?

Q   You don't know that to be --

A   Off the top of my head, no, I don't know that.

Q   Okay.  Please confirm that they are.

A   All right.  The first difference I see is the name, as you pointed out.  The second difference is the address of the assignor.  The next difference is in the

first "whereas" clause.  For David E. Hammer, P.A. it says, "Assignor has performed legal services for Bicoastal Holding Company."

On the Caligula assignment, if you will, it says, "Whereas, assignor has made two loans to Bicoastal Holding Company totaling $15,000 plus interest which are evidenced by the promissory notes attached hereto."

Q    Okay.  Except for the language specifically relating to the claims and the amounts of the claims and the assignors --

A    Well, Mr. Hodges, this is an assignment of those claims --

Q    Indeed, it is.

A    -- so what else is there?

Q    Indeed it is.  Well, there are seven paragraphs of text that appear to be identical.

A    All right.  Would you like me to compare the seven numbered paragraphs?

Q    Yes.

A    Yes.  The seven numbered paragraphs appear to be identical.

Q    Okay.  And you recognize your signature as David E. Hammer, president of David E. Hammer, P.A. on the second assignment; correct?

A    That's correct.

Q    Okay.  And do you recognize Dan Bilzerian's

signature on behalf of Caligula on the third assignment?

A    Yes, I do.

Q    Okay.

THE COURT:  My copy is now showing his

signature on that assignment.

MR. HODGES:  Dan Bilzerian's on the third

assignment?

THE COURT:  Yes.  But his.

MR. HODGES:  Mr. Hammer's?

THE COURT:  There is some scratch here,

Robert Bleakley and Dan Bilzerian, but.

MR. HODGES:  Yes.  That's the first

assignment.  That's from Mr. Bleakley.

THE COURT:  Uh-huh.

MR. HODGES:  The second assignment is from

Mr. Hammer --

THE COURT:  Oh, I see.

MR. HODGES:  -- and the third assignment is

from Dan Bilzerian.

THE COURT:  That's his signature.  All right.

BY MR. HODGES:

Q    All right.  Now, my question is:  Since two of the

assignors are lawyers, Mr. Bleakley and Mr. Hammer --

THE COURT:  Don't argue the case.  Ask him a

question.

MR. HODGES:  I am.

BY MR. HODGES:

Q   Why is it that Mr. Dan Bilzerian signed the complaint in this case?

A   You would have to ask Mr. Dan Bilzerian that.

Q   You didn't discuss that with him?

A   No, I didn't.

Q   Ever?

THE COURT:  That's not relevant.  It's not relevant.  Come on.  Let's go.

MR. HODGES:  All right.

BY MR. HODGES:

Q   Mr. Bleakley's assignment is different than yours and Caligula's; is it not?

A   Yes, Mr. Bleakley's assignment is different from mine and Mr. Bleakley's assignment is different from Caligula's.

Q   Okay.  And he gets a $25,000 return from the partnership if and when the partnership ever recovers anything on any of these claims; correct?

A   Mr. Hodges, the document speaks for itself.  I'm not --

Q   Is that your understanding --

A   -- going to --

Q    -- of it, Mr. Hammer?

A    I'm sorry?

Q    Is that your understanding of it?

A    Is what my understanding?

Q    Mr. Bleakley gets a $25,000 return from the partnership if and when the partnership ever recovers on these claims?

A    I'm not sure what you mean by the word "return."

Q    Well, it says he gets $25,000 back, doesn't it?

A    Well, it says -- I can read you what it says but I'm sure you can read that for yourself.

Q    Can you read that to yourself?

A    Okay.  (Reading document.)

THE COURT:  Is that in -- which document is that?

MR. HODGES:  In Bleakley's assignment, which is Exhibit 1 to this amended complaint.

THE COURT:  I don't see that 25,000.

MR. HODGES:  In paragraph 2 at the bottom of page 1.

THE COURT:  Limitation of 25,000.  Yeah, okay.  I've got it.  All right.

THE WITNESS:  Okay.  I've read it.

BY MR. HODGES:

Q    Okay.  Now Mr. Bleakley only gets $25,000 back if

and when the partnership --

THE COURT:  That's the cap.

BY MR. HODGES:

Q    -- recovers; correct?

THE COURT:  Yes.

BY MR. HODGES:

Q    Isn't that correct, Mr. Hammer?

A    What do you mean by the word "back"?

THE COURT:  That is a cap.  That's the maximum he can recover.

THE WITNESS:  Your Honor, that's correct. I'm not sure what Mr. Hodges is talking about.  Your Honor is correct.

THE COURT:  Sure.

MR. HODGES:  Thank you, Your Honor.

BY MR. HODGES:

Q    The promissory notes of Caligula were not attached to this amended complaint either, were they?

A    It appears that they were not.  I would like to make one other comment on the record to correct my testimony.  I believe I testified earlier that Exhibit 5 is a true and correct copy of the amended complaint.  This last document, the last page under Tab 5 entitled "certificate of limited partnership," I do not recognize that as being part of the amended complaint.

Q    You're not sure or you are sure?

A    I am sure that that is not part of the amended complaint.

Q    Is that because you prepared the amended complaint?

A    Yes.

Q    Okay.  So you did prepare the amended complaint?

A    Yes.

Q    All right.  So the last page entitled "certificate of limited partnership" you say is not part of the amended complaint?

A    That's correct.

Q    All right.

MR. HODGES:  I would like to then admit Exhibit 5 except for the last page.

THE COURT:  All right.

THE WITNESS:  No objection.

**(Whereupon, Debtor's Exhibit No. 5, previously marked for identification, was admitted into evidence.)**

BY MR. HODGES:

Q    Dan Bilzerian is not an attorney is he, Mr. Hammer?

A    Not to my knowledge.

Q    Okay.  Why is it that you're drafting documents

24

for a non-attorney to sign in a court proceeding on behalf of an entity?

A   I must have been mistaken.  I didn't review this carefully enough.  I thought that I had filed the amended complaint in this case.  I thought that.  And the reason I thought that is that was part of your oration in the beginning of this hearing.  But as it turns out, as I look more closely on page 4 of this document, this was filed by Dan Bilzerian himself.  So, no, I didn't prepare this.

Q   So now your testimony is you didn't prepare it and your testimony a minute ago was you did?

A   That's correct based on your representation.

Q   I see.  I see.  The assignments are all dated June 13, 2008; is that correct?

A   Well, let's see.  I think these documents speak for themselves, but I'll see what I can see.

THE COURT:  June 13th?

MR. HODGES:  Yes.

THE WITNESS:  The first assignment appears to be dated May 11, 2008, from the Bleakley Law Firm to Haircut Partners, LLLP.

THE COURT:  Yes.

BY MR. HODGES:

Q   You don't see the six over the five slash thirteen slash -o- eight?

25

A   At the beginning of the document it says "assignment of claims.  This agreement is made by and between the Bleakley Law Firm, 15170 North Florida Avenue, Tampa, Florida 33613, and Haircut Partners, LLLP" --

THE COURT:  May 11, 2008.

MR. HODGES:  As of May 11, 2008.

THE COURT:  Correct.

MR. HODGES:  But if you look at the signature page, it's dated June 13, 2008.

THE COURT:  That's what you're saying.

THE WITNESS:  Okay.

THE COURT:  The assignment is dated May 11 --

THE WITNESS:  Is there a question?

THE COURT:  -- but was actually signed apparently or assigned on August 13th.

THE WITNESS:  I'm sorry, Your Honor. August 13th?

THE COURT:  Yes.

THE WITNESS:  I don't see an August 13th anywhere.

THE COURT:  The last page.  Page three.

THE WITNESS:  Okay.

THE COURT:  Bleakley's signature and Bilzerian's signature.

THE WITNESS:  Yes.

26

THE COURT:  8/13.  That's an 8.

THE WITNESS:  That looked like a 6 to me.
I'm sorry.

MR. HODGES:  That could be an 8, Your Honor.

THE COURT:  What?

MR. HODGES:  That could be an 8.  I thought
it was a 6 written over a 5 but it could be an 8.

THE WITNESS:  Well, this document appears
to have been faxed twice, one on July 9th and once on
July 17th.

THE COURT:  Never mind the fax business.  The
number, to me, looks like an 8.  I don't know what it
is.

THE WITNESS:  Okay.

BY MR. HODGES:

Q    And yours is dated June 13; correct?

THE COURT:  June?

THE WITNESS:  My signature is dated June 13,
2008, yes.

BY MR. HODGES:

Q    And Mr. Dan Bilzerian's, on behalf of Caligula, is
undated; correct?

A    You see what I see, apparently.

Q    Okay.

A    Why you need me to describe these documents for

you is a little beyond me.

THE COURT:  Don't ask questions.  Just answer the question, please.

BY MR. HODGES:

Q    Mr. Hammer, do you recognize Exhibit 6?

THE COURT:  Which document are you talking about now?

MR. HODGES:  This is Plaintiff's motion for summary judgment in the --

THE COURT:  Number 6?

MR. HODGES:  -- in the Haircut case. Number 6.

THE COURT:  In what respect that is relevant here at all?

MR. HODGES:  Well, I'm laying a foundation for the --

THE COURT:  The fact such thing was filed.

MR. HODGES:  -- disputes over all of these claims.  All of them.

BY MR. HODGES:

Q    Do you recognize Exhibit 6, Mr. Hammer?

A    Exhibit 6 appears to be a annotated and twice-copied version of the document entitled "Plaintiff's motion for summary judgment," which is filed in the Haircut Partners, LLLP vs. Bicoastal Holding Company case.

28

Q    Did you prepare Exhibit 6?

THE COURT:  All these papers were facially filed by Bilzerian pro se?

MR. HODGES:  Dan Bilzerian, Paul's son --

THE COURT:  No, no.

MR. HODGES:  -- *pro se*.

THE COURT:  *Pro se* for an entity.

MR. HODGES:  For an entity in which two lawyers are partners.

THE COURT:  Don't argue.  Is that it?  All these papers filed by a *pro se* litigant on behalf of an entity?

THE WITNESS:  I believe, Your Honor, that, yes, that's what it appears, that --

THE COURT:  And the state court put up with that stuff?

THE WITNESS:  No.  The state court directed Mr. Bilzerian to retain counsel and I appeared for Haircut.

THE COURT:  I see.  The motion for summary judgment filed by Bilzerian, that was prepared by him or you, Plaintiff's motion for summary judgment.

THE WITNESS:  I don't know who prepared it.  I didn't prepare it.  I would assume it was prepared by him, but I don't know that for a fact.

THE COURT:  He knows how to prepare a motion for summary judgment?

THE WITNESS:  I don't know whether he knows how to prepare it or not.  I don't know who prepared it.

THE COURT:  Citing cases?  A layman?  All right.

THE WITNESS:  I still don't understand what that has to do with whether Caligula's notes are valid.

BY MR. HODGES:

Q    Do you recognize the document, Mr. Hammer?

THE COURT:  All right.

THE WITNESS:  Yes.  I have already told you it's the document -- it appears -- well, like I said, I recognize this as an annotated and marked-up copy --

THE COURT:  That's all right.  It's recognized.  Okay.  Motion -- that motion was filed by Dave [sic] Bilzerian in the state court action without an attorney.

MR. HODGES:  Yes.

THE WITNESS:  Right.

MR. HODGES:  Or at least under his signature.  Move to admit Exhibit 6.

THE COURT:  And we don't know who did it.  He denied he did it.  Okay.

30

                    (Whereupon, Debtor's Exhibit No. 6,

          previously marked for identification, was admitted into

          evidence.)

BY MR. HODGES:

     Q    Attached to that motion, Mr. Hammer, as Exhibit 2

is an affidavit of Terri Steffen; do you see that?

     A    I do see that.

     Q    Did you prepare that affidavit?

     A    I don't remember.

     Q    You don't remember?

     A    No.

     Q    Okay.  Do you know who Elizabeth Sandifer

(phonetic) is?

     A    No.

     Q    Okay.  All right.

     A    I wouldn't know her if she walked into this

courtroom right now.

     Q    Do you recognize Exhibit No. 7, Mr. Hammer?

                    THE COURT:  Who are these people, you said?

                    MR. HODGES:  Exhibit 7.

                    THE WITNESS:  I think Mr. Hodges is talking

          about Tab 7, Your Honor, in the binder.

                    THE COURT:  7?

                    MR. HODGES:  I'm sorry.  Yes.

                    THE WITNESS:  Yes.  I recognize it.

BY MR. HODGES:

Q    Okay.  And what is that document, Mr. Hammer?

A    It appears to be Defendant's first request for production of documents in the Haircut Partners, LLLP vs. Bicoastal Holding Company case in the Circuit Court of the Thirteenth Judicial Circuit in and for Hillsborough County, Florida, in the general civil division.

Q    Okay.  And did you receive this document from Mr. Menchise?

A    Yes.

Q    As part of your representation of Haircut Partners?

A    Yes.

MR. HODGES:  I would like to move in Exhibit 7.

THE WITNESS:  I'm going to renew my objection on the basis of relevance.

THE COURT:  Why is that relevant; would you tell me?

MR. HODGES:  Because Mr. Menchise, by this document, sought the corroborating evidence that would --

THE COURT:  He didn't get it.  So what --

MR. HODGES:  And he didn't get any.

THE COURT:  What does that prove of the

disputed claim?

THE WITNESS:  Well, that's false.

THE COURT:  Hold it.

MR. HODGES:  He either got -- well, he got two promissory notes in response to this document.

THE COURT:  Yes, that's the --

MR. HODGES:  None of those --

THE COURT:  -- promissory notes we're talking about.

MR. HODGES:  Those notes had never been even attached to the lawsuits.

THE COURT:  Don't argue the stuff, please.  I don't know why that is -- it's not relevant.  Forget about it.

MR. HODGES:  Okay.  It's relevant, Your Honor --

THE COURT:  It is not relevant.

MR. HODGES:  -- because it shows that Mr. Menchise, as early as August, sought --

THE COURT:  He tried to get it and didn't get it.  Why is that relevant?

MR. HODGES:  Because they did produce some documents.

THE COURT:  Go to the documents what he produced.  Forget about --

33

MR. HODGES:  I'm headed there.  I'm just laying the foundation, sir.

THE COURT:  We're going to be here until doomsday until you lay the foundation.  It's not relevant, 7.  He asked for it.

MR. HODGES:  Yes.  And that's all I'm admitting it for is to show that he asked for it.

THE COURT:  Why is that relevant that he asked for it?

MR. HODGES:  Because I want to show the documents he received.

THE COURT:  But on Menchise as a witness and say I asked for it and that's what I got -- received.

MR. HODGES:  That's all I'm seeking admission of this document for, Your Honor --

THE COURT:  Not through him.  No, no.

MR. HODGES:  -- is to lay that foundation.

THE COURT:  Not through his testimony.

MR. HODGES:  All right.

BY MR. HODGES:

Q    And do you recognize Exhibit No. 8, Mr. Hammer, or what's marked as Tab 8?

A    I do.

Q    And what is Tab 8?

A    Tab 8 appears to be the response and objection to

34

Defendant's first request for documents in the Haircut Partners, LLLP vs. Bicoastal Holding Company case in the Circuit Court of the Thirteenth Judicial Circuit in and for Hillsborough County, Florida in the general civil division.

Q    And is that your signature on that document?

THE COURT:  Mr. Hodges, I ruled and I'm going to say it again.  I don't want to hear anything about what was produced, what wasn't produced except from the person who got what he got which is relevant and put in evidence.  Whether he filed a response to it is not relevant.

MR. HODGES:  Except he agrees to produce it all in this response.

THE COURT:  He produced a million things and didn't do it.

MR. HODGES:  In this response --

THE COURT:  The remedy is -- no, no, no.  The remedy is in the state court to compel him to answer it, not here.  I have nothing to do with it.  I have nothing to do with it.  Whether he asked for it nothing to do with it.  Whether he objected to it -- made a promise to do it and didn't do it, nothing to do with it.

MR. HODGES:  All right.

BY MR. HODGES:

Q    Mr. Hammer --

A    Yes, sir.

Q    -- did you represent Bicoastal Holding Company at the time you entered this case on behalf of Haircut Partners?

A    In what matter?

Q    In any matter.

A    I don't recall.  If you could name a specific matter, maybe it would refresh my recollection.

Q    Were you counsel for Bicoastal Holding Company in any matter in July and August 2008?

A    (No response.)

        THE COURT:  Do you know?

        THE WITNESS:  I think I was in maybe one matter.  Certainly not in this matter.  If you would please specify what matter it is you're talking about, maybe I could give you a better answer.  Was I their -- was I general corporate counsel?  No.  So, I mean, I guess maybe if you would tell --

        THE COURT:  You appeared or represented -- gave legal advice to Bicoastal, the Defendant in the lawsuit?

        THE WITNESS:  In this case?  No, Your Honor.

BY MR. HODGES:

Q    In any other case?

36

THE COURT:  In any other matter.

THE WITNESS:  In any other matter?  I think so, yes, Your Honor.

THE COURT:  All right.

BY MR. HODGES:

Q    You were representing Bicoastal Holding Company in a case called Haire vs. Bicoastal, were you not?

A    Ah, yes.  That does refresh my recollection. Thank you, Mr. Hodges.  Yes.

THE COURT:  You represented Bicoastal --

THE WITNESS:  Haire vs. Bicoastal, where Mr. Haire was suing Bicoastal.

BY MR. HODGES:

Q    And would you please turn to Tab No. 13?

A    Okay.

Q    Does that appear to be the Hillsborough County court docket in the Haire vs. Bicoastal Holding Company case?

A    That I really don't know.  I don't have this docket memorized.  I apologize, Mr. Hodges.

THE COURT:  You have no way to dispute that is the proper court document.

THE WITNESS:  That's not true, Your Honor. For example, this appears to --

THE COURT:  Can you dispute that?  What

37

evidence are you going to put on to dispute that this doesn't represent the docket in that case?

THE WITNESS:  Well, I don't know.  This is the first time I have ever seen this document.  Now this appears -- what this appears to be is a printout from the Hillsborough County Clerk website.  Now whether this is a complete docket, I don't know.

For example, on the website there are two options.  You can get the docket only from one party or you can get it from all the parties.  You can limit the docket results by certain options.  And this printout doesn't indicate whether it was limited.

THE COURT:  Clearly adding that too, that you represented that litigant -- Bicoastal in that litigation.  That's all it says.

THE WITNESS:  I already testified that I do --

THE COURT:  He already said it.  So why waste time with this thing?  You don't even need the document.

MR. HODGES:  Okay.

THE COURT:  He admitted he represented Bicoastal.

MR. HODGES:  Except it shows that he is still Bicoastal's counsel in this case.

38

THE COURT:  Well, ask that question.  Are you still --

BY MR. HODGES:

Q    Are you still Bicoastal's counsel in this case?

A    I don't know.

Q    You have not withdrawn have you, Mr. Hammer?

A    The reason that I don't know is because this case that we're in here today, In re Bicoastal Holding Company, in the Bankruptcy Court here, stays this case.  This is an action against Bicoastal Holding Company.  So I can't do anything in it, I can't withdraw, I can't do anything.  This case is stayed until the resolution of this case that we're in here.  So Mr. Hodges' question of whether I continue to represent Bicoastal --

THE COURT:  On paper you are still counsel of record in that case, who appeared in that case.

THE WITNESS:  Oh, yes.  Mr. Hodges didn't ask that.

THE COURT:  That's right.  That's right.

THE WITNESS:  Sure.

BY MR. HODGES:

Q    And you were counsel of record in that case on November 5, 2008?

A    Yes.

Q    And November 6, 2008; correct?

A     Yes.

Q     And you were representing Bicoastal in litigation at the same time you sued it and filed an involuntary bankruptcy Petition against it; is that correct?

A     I represented Bicoastal in a frivolous action brought by Mr. Haire against Bicoastal --

Q     It's --

A     Are you going to let me finish answering your question or not, Mr. Hodges?

Q     It's a yes-or-no question, Mr. Hammer.

A     It was not a yes-or-no question.

THE COURT:  Let's not litigate or argue what you're talking about.

THE WITNESS:  You either want me to --

THE COURT:  What is the question?

MR. HODGES:  My question was:  Was he not representing Bicoastal Holding Company in litigation against Mr. Haire on the day he filed the bankruptcy Petition in this case.

THE COURT:  Yes or no?

THE WITNESS:  It is a vague question.

THE COURT:  It's not vague to me.  It's very clear to me.

THE WITNESS:  Okay.  Perhaps I could explain. I represented --

THE COURT:  It's not vague.

THE WITNESS:  -- Bicoastal Holding Company in this case, in Haire vs. Bicoastal, at the time that I on behalf of Haircut Partners filed this involuntary case --

THE COURT:  Correct.

THE WITNESS:  -- yes, Your Honor.

THE COURT:  All right.

BY MR. HODGES:

Q    Okay.  And you had represented Bicoastal for approximately a year at the time you filed the bankruptcy Petition?

A    I don't know off the top of my head, Mr. Hodges. Is there something you wish to refresh my recollection with?

Q    Well, were you the only lawyer for Bicoastal in the Haire vs. Bicoastal case?

A    Yes.

Q    And that case was filed April 3, 2007 according to the docket; correct?

A    Yes.

Q    So you had actually represented Bicoastal for more than 18 months at the time you filed the bankruptcy Petition in this case; correct?

A    Let me think about that.  I'll do the math.  One second.

41

Q    So 19 months and three days.

A    For fewer than 19 months but greater than 18 months, Mr. Hodges.

Q    Okay.  You had represented Bicoastal in other matters in state court, had you not?

A    I have.

Q    You have sued Mr. Haire in fact on behalf of Bicoastal in state court; correct?

A    Yes, I have.

Q    Okay.  And do you still represent Bicoastal in that case?

A    Yes, I believe I do.  Yes.

Q    Okay.  Have you obtained conflict waivers from Bicoastal Holding Company that would permit you to commit such a heinous act as filing an involuntary bankruptcy Petition against it?

THE COURT:  Strike the word "heinous."  Filed an involuntary case on behalf of Haircut Partners.

MR. HODGES:  Against his client whom he still represents.

THE WITNESS:  And what's your question, Mr. Hodges?

BY MR. HODGES:

Q    Have you obtained conflict --

THE COURT:  At the time you filed as

42

counsel of record on behalf of Hair [sic] Partners an involuntary case against Bicoastal, an opposing entity --

THE WITNESS:  Yes.

THE COURT:  -- you still represented the opposing entity also in some other litigation.

THE WITNESS:  That's correct.

THE COURT:  And the next question was:  Did you get authorization from Bicoastal to file against it an Involuntary Petition?

THE WITNESS:  (No response.)

THE COURT:  Obviously not.  That's all in the family business.  No, no.

MR. HODGES:  The only way that this is at all ethical is if it is collusive.

THE COURT:  We don't do ethicals.  Forget about it.  I know what the fact is.

MR. HODGES:  Okay.

THE WITNESS:  Your Honor, if -- on November 6, 2008, Terri Steffen was the sole officer and director --

THE COURT:  I know.

THE WITNESS:  -- of Bicoastal.

THE COURT:  All right.

THE WITNESS:  So my --

THE COURT:  And her son was Hair [sic] Partners.

THE WITNESS:  And my continuing representation of Bicoastal in its cases against Mr. Haire was with her continued consent.

BY MR. HODGES:

Q   Is that a no, Mr. Hammer?

THE COURT:  No.  By consent of Terri Steffen --

THE WITNESS:  Correct.

THE COURT:  -- the sole officer of Bicoastal.

THE WITNESS:  That's correct.

BY MR. HODGES:

Q   You have written conflict waivers?

A   (No response.)

Q   Is that your testimony?

THE COURT:  All in the family.  There's no conflicts here.

THE WITNESS:  Do we have anything about whether the Caligula -- Caligula's debt to --

BY MR. HODGES:

Q   Mr. Hammer, please --

THE COURT:  No, no.  Don't ask questions. He's asking the questions.  Come on.

BY MR. HODGES:

44

Q   -- answer the question.  Please answer the question, Mr. Hammer.

THE COURT:  No, no, no.  No question here. Go ahead.

MR. HODGES:  Are you sustaining his objection?

THE COURT:  Yes.

MR. HODGES:  Okay.  So as a matter of law there aren't any conflicts in this?

THE COURT:  I'm not judging on conflicts. I'm not doing anything with it.  Let's not gild the lily.  Just focus the attention on what we are litigating here.

THE WITNESS:  And, Your Honor, in fact if I could just inform the Court of something that's currently pending, Mr. Haire has filed multiple Bar grievances against me and that's what this is --

THE COURT:  That's all right.  That's all right.

THE WITNESS:  I just want the record to reflect that this is what they're doing.  They're trying to do --

THE COURT:  This record should not reflect that.  That is nothing to do with -- I strike it.  I don't want pro or con anything about your private feud

45

between Haire.  Forget about it.

THE WITNESS:  Okay.

THE COURT:  Haire is not involved in this lawsuit either as a plaintiff or as a defendant.

THE WITNESS:  That's true.

THE COURT:  Go ahead.

BY MR. HODGES:

Q    Mr. Hammer, I would ask you to turn to Exhibit 14.

A    Yes, sir.

Q    Do you recognize that document?

A    I do.

Q    What is that document?

A    This appears to be a copy of the document that I filed under seal in the state court matter of Haircut Partners, LLLP vs. Bicoastal Holding Company which apparently Mr. Menchise has provided you without authorization.

Q    Do you not recall Judge Paskay ordering Mr. Menchise to produce to me everything that you had produced to him in that litigation?

A    In discovery or in -- or are we talking about sealed documents, Mr. Hodges?  I'm not -- I guess I don't understand your question.

Q    In discovery, Mr. Hammer.

A    Yes, I do.  This was not produced in discovery.

46

Q   All right.  But you can identify this as Mr. Bleakley's engagement letter with Jack Rabbit Limo Service?

A   Oh, no.  I didn't say that.  What I identified this as is the document that I produced to Mr. Menchise.

THE COURT:  You're not the author of -- you're not the addressee.  You didn't write that letter, did you?

THE WITNESS:  Right.  No.  Absolutely not. And that's what I'm trying to tell Mr. Hodges.

THE COURT:  He neither wrote the letter, nor is he the addressee.

MR. HODGES:  I understand, Your Honor.

THE COURT:  Why are we going to talk about somebody else's letter?

MR. HODGES:  Well, I want to dispute Mr. Bleakley's fees and this is the basis for those fees.

THE COURT:  Not that way.  No, no.

MR. HODGES:  Thank you, Your Honor.

BY MR. HODGES:

Q   Do you recognize the documents behind Tab No. 16?

A   I do.

Q   What are those documents?

A   These are the documents that I produced to

47

Mr. Menchise in discovery in the state court litigation

of Haircut Partners, LLLP vs. Bicoastal Holding Company

in contrast with those documents under Tab 14, which I did

not produce in discovery.

Q    Are these all the documents you produced to

Mr. Menchise?

A    I don't recall.

THE COURT:  Makes no difference what he did

not produce.  These are the documents he admits he

produced.  That's his documents.

MR. HODGES:  Yes.

BY MR. HODGES:

Q    And these are -- what did these purport to be?

Are these invoices of David Hammer, P.A.?

A    These appear to be invoices from --

THE COURT:  December 31, '07 --

THE WITNESS:  -- Bleakley Law Firm.

THE COURT:  -- up to and including 8/15/07.

THE WITNESS:  They speak for themselves,

Mr. Hodges.

BY MR. HODGES:

Q    My question is, Mr. Hammer:  Are these your

invoices to Bicoastal Holding Company?

A    No.  These are -- these appear to be invoices from

the Bleakley Law Firm.

THE WITNESS:  Exhibit 16?

THE COURT:  No.  These are yours.

THE WITNESS:  Oh, 16?

MR. HODGES:  Is that 16?

THE WITNESS:  Oh, you said 15.

BY MR. HODGES:

Q    No.  16.

A    16.

THE COURT:  Your invoices given to Bicoastal.

THE WITNESS:  Oh.  Tab 16.  Yes.

THE COURT:  Correct.

THE WITNESS:  Yes.  Yes.  That's correct.

BY MR. HODGES:

Q    Those are your invoices to Bicoastal?

A    Yes.

Q    And they bear an address of 212 Crystal Grove
Boulevard, Lutz, Florida.  When did you move into that
address?

A    I don't recall exactly.

Q    Wasn't it Labor Day 2008?

A    Sometime around then.

Q    Okay.  And so these invoices were created after
that date; correct?

A    Perhaps I don't understand your question.

THE COURT:  The question is:  It was

49

intimated that your invoices you submitted to Bicoastal was not a contemporaneous recordation of services because the address indicated on it was not your address at all.

THE WITNESS:  And that intimation is incorrect.  These were reprinted after Labor Day of 2008 and when they were reprinted they were reprinted with the new address.  However, they were originally issued prior to Labor Day 2008 with different addresses.  When you reissue an invoice, Mr. Hodges, which I know you don't do because you only represent Mr. Haire as general counsel, but when you reissue an invoice and you would like to get paid on it, generally you put your current address.  Does that make sense to you?

THE COURT:  It makes no difference.

MR. HODGES:  No, Mr. Hammer, it doesn't.

THE COURT:  It has to make sense to me.  All right.  Forget about it.  Don't make these comments, please.  Come on.  Let's go.

BY MR. HODGES:

Q    Mr. Hammer, do you recognize the documents behind Tab 18?

A    I recognize this first page.  I don't recognize the second page.

50

Q    Is that because it doesn't bear my signature?

A    I don't know why I don't recognize it, I just don't recognize it.

Q    You have never received that letter?

THE COURT:  You received that letter?

THE WITNESS:  I think I may have received a letter from you on January --

THE COURT:  That's all we're talking about. 18.

THE WITNESS:  -- 2, 2009, but I don't --

THE COURT:  The other paper with it --

THE WITNESS:  -- know that this is a correct copy of it.

BY MR. HODGES:

Q    Okay.

A    I also think I received an e-Mail from you on January 2, 2009.

THE COURT:  He's not asking about the e-mail. Exhibit 18 was addressed to you and you received it; right?

THE WITNESS:  Well, there are three documents under Tab 18, Your Honor.

THE COURT:  Only the top one.

THE WITNESS:  Oh, the top one?  Yes.  I already testified --

51

THE COURT:  That's right.

THE WITNESS:  -- I recognize the top one.
That's one page.

THE COURT:  And the other two you --

BY MR. HODGES:

Q    And did you receive the second one?

THE COURT:  Unsigned.  Did you get it?

THE WITNESS:  I don't recall if this is a
correct copy, but I do recall that I received a letter
from you, Mr. Hodges, on January 2, 2009 by fax.

BY MR. HODGES:

Q    To the effect of can I get the Bicoastal books and
records and assets now?

A    Yes.

Q    Okay.  And do you recognize the third document;
did you receive that?

A    Well, I certainly didn't receive this document.  I
received an e-mail with the text that's contained in this
document, but this appears to be a printout from your
computer, Mr. Hodges.

Q    It is.

MR. HODGES:  Move to admit 18.

THE WITNESS:  Objection.  Hearsay.

THE COURT:  What is that?

MR. HODGES:  The letters demanding --

52

THE COURT:  What?

MR. HODGES:  Move to admit 18.

THE COURT:  18.

THE WITNESS:  I said objection.  Hearsay.

THE COURT:  Admission of party of interest.

THE WITNESS:  Is Todd Hodges a party of interest?  If he is, I would --

THE COURT:  No.  Letter from him to you is admitted or hearsay?

THE WITNESS:  Hearsay.

THE COURT:  You admitted that you got it. May be a question of not relevant.

THE WITNESS:  Well --

THE COURT:  If a witness received a letter from somebody and acknowledged he got it, that proves he got that letter, that's all.

THE WITNESS:  Sure.

THE COURT:  Sure.  That's all.

THE WITNESS:  Okay.

THE COURT:  All right.

THE WITNESS:  I agree with Your Honor.  Sure.

THE COURT:  All right.

**(Whereupon, Debtor's Exhibit No. 18, previously marked for identification, was admitted into evidence.)**

53

BY MR. HODGES:

Q    What role does Terri Steffen have in Haircut Partners?

A    Terri Steffen is the president of Bicoastal Holding Company and Bicoastal Holding Company owes a sum of money to Haircut Partners.

Q    Is she a partner in Haircut Partners?

A    No, sir.

Q    Is her son Dan Bilzerian?

A    Yes.

Q    Does she execute documents on behalf of Haircut Partners?

A    No.

Q    Do you represent Ms. Steffen?

THE COURT:  Who?

MR. HODGES:  (No response.)

THE COURT:  Who?

MR. HODGES:  Mr. Hammer.

THE COURT:  Oh, you.

THE WITNESS:  In some matters I represent Ms. Steffen, yes, Mr. Hodges.

MR. HODGES:  Okay.

THE WITNESS:  Your Honor, I would note that Mr. Menchise has walked into --

THE COURT:  Let's not note anything.

54

THE WITNESS:  I request to invoke the Rule, Your Honor.  Mr. Menchise --

THE COURT:  It's too late now, isn't it?

THE WITNESS:  Well, Mr. Menchise walked in during my testimony.

THE COURT:  Well, you could have spoken right away.

THE WITNESS:  Yes, I suppose I could have.  I was --

THE COURT:  You should have.  All right.  He can stay.  Go ahead.

MR. HODGES:  May I have a moment, Your Honor?

THE COURT:  What?

MR. HODGES:  May I have a moment?

THE COURT:  Well, go.  But let's go.

BY MR. HODGES:

Q    Mr. Hammer, who are the other partners of Haircut Partners?

A    There are three partners in Haircut Partners, LLLP:  Dan Bilzerian, Caligula Corporation and David E. Hammer, P.A.

Q    Do you know what their respective percentage interests are?

A    No, sir.

Q    What is Haircut's business?

55

A    I don't know.

THE COURT:  To litigate.

BY MR. HODGES:

Q    Is it -- as far as you know, is its only business litigating?

A    The only activity that I'm aware of that Haircut is involved in is in its collection of these debts from Bicoastal.

Q    Did Ms. Steffen consult with you before giving her affidavit to Haircut Partners in the state court litigation?

A    I don't remember.

Q    It's possible?

A    Anything is possible except you keeping to the subject.

THE COURT:  We don't deal with possibilities. Forget about it.  His answer is he doesn't remember. All right.

MR. HODGES:  I have nothing further.

THE COURT:  Thank you.

MR. HAMMER:  No cross-examination, Your Honor, but I'll reserve the right to testify in --

THE COURT:  On your own.

MR. HAMMER:  Yes.  In my case in rebuttal.

THE COURT:  Correct.  Okay.  Thank you. What's next?

56

MR. HODGES:  Ernest B. Haire.

*  *  *  *  *

(Whereupon, Mr. Hodges called and examined Mr. Haire.)

*  *  *  *  *

MR. HODGES:  I call Douglas Menchise.

THE COURT:  Mr. Menchise.

Whereupon,

**DOUGLAS MENCHISE**

was called as a witness and, after being duly sworn to tell the truth, testified herein.

**DIRECT EXAMINATION**

BY MR. HODGES:

Q    State your name for the record, please.

A    Douglas Menchise.

Q    Mr. Menchise, are you the Trustee for Terri Steffen in her Chapter 7 bankruptcy?

A    I am.

Q    All right.  Are you here today in response to a subpoena that was served upon you by me?

A    I am.

Q    And did you bring documents with you in response to --

A    Yes, I did.

Q    -- the request?  And may I see those, please?

57

MR. PETERSON:  Your Honor, if I could just interrupt.  What are we hearing right now?

THE COURT:  The motion to dismiss the involuntary case.

MR. PETERSON:  Filed by Bicoastal?

THE COURT:  Yes.

MR. PETERSON:  Okay.  I'm not sure where Mr. --

THE COURT:  Yes.

MR. PETERSON:  I'm not involved in that.

THE COURT:  I understand that.

MR. PETERSON:  Okay.  Thank you.

MR. HODGES:  May I approach the witness, Your Honor?

THE COURT:  Go ahead.

MR. HODGES:  Thank you.

THE WITNESS:  I've brought -- I've brought my file from the state court case but there's other stuff mixed in here.

BY MR. HODGES:

Q   I understand.  The first --

THE COURT:  Let's not -- that's masses of paper.  Specific documents --

BY MR. HODGES:

Q   The first category of documents --

58

THE REPORTER:  You're going to have to get by a microphone because of all this banging.

MR. HODGES:  I'm sorry.

BY MR. HODGES:

Q    The first category of documents that I would like you to examine are the documents produced to you in the Haircut Partners vs. Bicoastal case in state court.

A    Yes.  I have -- you're referring to the discovery?

Q    Yes.

A    Yes.  I have that here.

Q    Okay.

A    This is also my file from that state court litigation.

Q    All right.  Would you quickly compare the documents that --

THE COURT:  Let the record show that Mr. Hammer now arrived at 1:23.

THE COURT:  Go ahead.

BY MR. HODGES:

Q    Would you quickly compare the documents that were produced to you in the Haircut case with the documents behind Tab 1 in the notebook in front of you?

A    They appear to be the same.  The first two pages on the court exhibits are the promissory -- two promissory notes and those happen to be the first two on my pile.  This

59

third document is a letter dated May 14, 2007 from the

Bleakley Law Firm which is also the third document in mine.

And then the rest appear to be time sheets.  I don't know --

THE COURT:  We have that in the book?

MR. HODGES:  Yes.  Tab 1.

THE COURT:  What we heard before?

MR. HODGES:  Pardon?

THE COURT:  We covered that.  Didn't we cover

it?

MR. HODGES:  No.  We haven't admitted it.

He's my witness to admit it.

THE COURT:  All right.  Tab --

MR. HODGES:  Tab 1.

THE COURT:  Tab 1?

MR. HODGES:  Yes.

THE COURT:  The promissory note?

MR. HODGES:  And -- it's actually about 110

pages, Your Honor.  The promissory note --

THE COURT:  Bleakley's letter?

MR. HODGES:  -- what purports to be an

engagement letter --

THE COURT:  Yes.

MR. HODGES:  -- and --

THE COURT:  And the services rendered by

Bleakley.

60

MR. HODGES:  -- a hundred pages of invoices.

THE COURT:  All right.

THE WITNESS:  Yes.  It appears to be -- it appears to be the same.  Without going through each page comparing them to each page that I have, they appear to be the same.  These appear to be the documents that were turned over to me in response to a request to produce in the state court case of Haircut vs. Bicoastal.

BY MR. HODGES:

Q   Okay.  And are those all the documents produced to you in that case?

A   These appear to be all the documents that were produced to me.  Without going through each and every single one of them, they appear to be the ones that were produced to me.

MR. HODGES:  Move to admit Exhibit 1.

MR. HAMMER:  No objection.

THE COURT:  All right.

**(Whereupon, Debtor's Exhibit No. 1, previously marked for identification, was admitted into evidence.)**

BY MR. HODGES:

Q   All right.  Mr. Menchise, would you turn to Tab 7, please?

61

A   Okay.

Q   And was that your request for production in that case?

A   It appears to be, yes.

Q   And the documents at Tab 1 were produced in response to that?

A   Yes.

Q   And can you identify the document at Tab 8?

A   Yes.  This appears to be the response -- this is the response that I received in that litigation.

Q   All right.

MR. HODGES:  Move to admit 7 and 8, Your Honor.

MR. HAMMER:  Your Honor, I object on the basis of relevance.  Your Honor already ruled --

THE COURT:  What are we doing here?  Let's focus on the objection of the three claims assigned to Hair [sic] Partners.  That's all.

MR. HODGES:  These all relate to that.

THE COURT:  What he asked for and didn't get is not relevant.

MR. HODGES:  Your Honor, these all do relate to those three claims.

THE COURT:  They don't relate.  Put -- go to the specific items what we're talking about.

62

MR. HODGES:  I'm about to start.

THE COURT:  He's not objecting to the claims.

MR. HODGES:  I just need to lay my foundation, Your Honor.

THE COURT:  No.  The foundation is too big. We covered that.  What he asked for and what he didn't get is not relevant at all.  It's not relevant.

MR. HODGES:  All right.

THE COURT:  The notes are -- the Bleakley notes are apparently relevant because what appears in the book is no documentary stamps in it; therefore, you contend they are a legally unenforceable obligation.

MR. HODGES:  All right.

THE COURT:  The other one I don't know.  I don't want to relitigate the state court litigation here at all.

BY MR. HODGES:

Q    Mr. Menchise, was that document production the very first time you ever saw those two promissory notes at the front of Exhibit 1?

A    I believe so, yes.

Q    Do you recall when that document production took place?

A    This document production in the Haircut litigation?

63

Q    Yes.

A    Yes.  It took place in late summer of '08.
September, October.  I think it was -- we had a hearing on
October 7th, I believe.  It was a motion for summary
judgment.  And I had filed a motion to compel production of
the documents.  We had a court hearing.  It was a multi-
hearing calendar.  A motion for summary judgment, my motion
to compel, my motion to, I believe, continue and motion for
mediation.  And at that time the -- Mr. Hammer said he had
the documents, so I withdrew the motion to compel.  I think
it was October 7th, or something like that.

Q    Of 2008?

A    Yes.

Q    Did Ms. Steffen produce the documents to you?

A    As I remember, Ms. Steffen had the documents
outside.  And -- outside in the judge's chamber.  And as I
went outside she offered them to me and I said please give
them to your attorney, he'll give them to me.  And then I
believe he gave them to me at a hearing in the Bankruptcy
Court within a couple of days.

Q    Did you dispute in the state court case the
validity of the debts that were claimed by Haircut?

A    I filed an answer -- I filed a motion to dismiss
originally because there were no documents attached to the
complaint.  And there was no contract; there were no

64

promissory notes.  So, I filed a motion to dismiss.  That motion was denied.  The judge ordered that these documents be produced and there be, I believe, an amended complaint filed and the contract and the notes filed.

I filed an answer without knowledge essentially because essentially I didn't have any knowledge to the allegations.  So in that respect I contested it, as opposed to agreeing with it, because I didn't have enough information or knowledge about this alleged debt.  I can tell you that from my perspective it didn't pass the smell test and it just looked very suspicious to me.

Q    Okay.  When you say it "didn't pass the smell test," what do you mean by that?

A    It just -- after -- you know, I have been doing this for many, many years.  I have seen a lot of lawsuits.  I've participated in a lot of lawsuits.  It just didn't seem that somebody would -- first of all there was no contract; okay?  There was no agreement in writing between Mr. Hammer and either Bicoastal or Ms. Steffen regarding the attorney's fees.  Because I had asked them, you know:  Do you have a contract?  In fact, the judge, I think, in the state court wanted to know what the contract -- what the terms were.  And there was no written contract for Mr. Hammer.

And the nature of the suit and the claims between Haircut, the Bilzerians, Ms. Steffen and Haire were very

65

complicated matters.  And they're not the clear-cut type of lawsuit that you see, the run-of-the-mill lawsuit, and it just didn't seem to me that somebody would take a case like this without a contract and on an hourly basis.  Because, generally, you see these things on a contingency basis. Second of all --

THE COURT:  Ms. Hervey, you can come up here.

THE WITNESS:  Second of all, okay, I had known that there has been a lot of different litigation going back and forth between the Bilzerian camp on one side and the Haire camp on the other side.  And I didn't know whether or not they were --

THE COURT:  Off the record.

(Discussion off the record.)

THE COURT:  Go ahead.

THE WITNESS:  Okay.  So, I knew there was a lot of lawsuits because when I became Trustee in this case I came into the middle of the OHLP involuntary bankruptcy and there was a lot of fighting going back and forth and a lot of litigation going back and forth. And I didn't know whether or not the billing was being put on to Bicoastal, as opposed to OHLP, as opposed to one of the other entities that were involved in these various fights, such as Puma, such as --

THE COURT:  Jack Rabbit.

66

THE WITNESS:  -- Caligula, Jack Rabbit.  I didn't know.  So I wanted to see some contracts, I wanted to see some documents, I wanted to see some billing.  And it just didn't seem like a normal, everyday type of lawsuit.  And that's why, to me, I say it didn't pass the smell test.

BY MR. HODGES:

Q   Okay.  How about the promissory notes allegedly from Bicoastal to Caligula?  You say you had never received those until Mr. Hammer produced them to you sometime in October in this court?

A   Pursuant to the discovery request in the Haircut case.

Q   Yes.  But prior to that they hadn't produced those?

A   No.  As far as I know, no.  Not to me.

Q   Okay.  How many times, Mr. Menchise, since you became Trustee in Ms. Steffen's bankruptcy case have you asked for Bicoastal records and books?

MR. HAMMER:  Objection.  Relevance.

THE COURT:  Again, the discovery dispute. It's not relevant.  The fact remains he didn't get it and he can't do anything about it.

MR. HODGES:  Maybe.

BY MR. HODGES:

67

Q   Did you see any -- did you -- was any evidence ever produced to you that showed Bicoastal actually received the proceeds of those two notes?

A   No.

Q   Was any discovery ever produced to you that showed --

THE COURT:  Do you have any personal knowledge, either derived from Bicoastal records which you received as a result of the production or in any other source direct to you, that these notes were representing valid obligations?

THE WITNESS:  No.  I didn't see any evidence of that.

BY MR. HODGES:

Q   Did you see any Bicoastal borrowing resolutions in the corporate records?

A   No.

Q   Did you see any demand made on Bicoastal for repayment of these notes?

A   No, I didn't.

Q   Did you see any documentary stamp tax returns?

A   No.  In fact, that was one of my grounds for dismissal, that there were no doc stamps.  And I seem to recall Mr. Hammer saying when we went into court that has been resolved, but I never saw them.

68

Q    What was the outcome of the state court litigation?

A    The judge in the state court continued everything or essentially stayed everything because of the concerns that he had and that I raised --

THE COURT:  We covered that.  Because of the D.C. --

THE WITNESS:  The injunction.

THE COURT:  -- injunction.

THE WITNESS:  I thought it might have been a condition precedent.

THE COURT:  Stopped it because of the outstanding order to show cause out of the District Court.

THE WITNESS:  That's correct.  And he requested that we contact the Court, and both myself and Mr. Hammer did, to find out whether or not this would be violating the injunction.  And I haven't heard anything back from the District Court.

THE COURT:  That's my question I asked before.  Anybody followed through with that order to show cause with the District Court, it's okay or not okay, or what?

THE WITNESS:  As far as I know, okay, it has not yet been decided.  I had followed through with the

69

Haircut case and I had requested, as did Mr. Hammer, that the D.C. Court issue, I guess, a ruling or an advisory --

THE COURT:  Either discharge the show cause or find him in contempt.

THE WITNESS:  Yes.  Or let us know whether or not this litigation was part of the injunction.  And that was the concern that the state court had because he was afraid, as he said, that he might be held in contempt by the D.C. judge.

THE COURT:  And you didn't hear from them?

THE WITNESS:  No.

THE COURT:  When was the last time?

THE WITNESS:  Did not hear from them.  And as far as I know, it has not yet been decided by the D.C. Court.

THE COURT:  What's the District Court -- who is the judge?

THE WITNESS:  Judge Lamoth, Lambert, or something like that.

MS. HERVEY:  Lamberth.

THE COURT:  Lamberth?

MR. HAMMER:  It's Royce, R-o-y-c-e, Lamberth, L-a-m-b-e-r --

THE COURT:  Royce, R --

70

MR. HAMMER:  R-o-y-c-e, Lamberth, L-a-m-b-e-r-t-h.

THE COURT:  Does anybody have a phone number for him?

MR. HAMMER:  I have a phone number, Your Honor.

THE COURT:  Can you give it to me?

MR. HAMMER:  Yes.

THE WITNESS:  One of the concerns I had was that if permission was needed or required from the D.C. Court for the maintenance of these lawsuits and it wasn't obtained, then how can somebody recover attorney's fees for filing lawsuits that were in violation of an injunction.  And I had brought that up to the state court judge and he had the same concern, I think.

THE COURT:  What's the number; do you have it?

MR. HAMMER:  Yes.  One second.  Okay.  It is area code 202-354-3388.  And that is the number to his law clerk.

THE COURT:  All right.

MR. HAMMER:  The law clerk's name is Andrew, A-n-d-r-e-w, Elliott, E-l-l-i-o-t-t.

THE COURT:  Okay.  Thank you.

71

MR. HAMMER:  Certainly, Your Honor.

THE COURT:  Go ahead.  Anything else from him?

MR. HODGES:  Yes.

BY MR. HODGES:

Q    Mr. Menchise, you were acting as Bicoastal's lawyer in the state court lawsuit?

A    I was acting on behalf of the bankruptcy estate. And in my pleadings I put down as Trustee for the Estate of Terri Steffen.  But I did file an answer, I guess, in behalf of Bicoastal.  But in the pleading, in the caption, I wrote, as Bankruptcy Trustee for the Estate of Terri Steffen.

Q    And --

A    And was very plain to point out to the judge that Bicoastal was not in bankruptcy, that Terri Steffen was and that Terri Steffen owned the stock and that my effort was to try to preserve the value of the stock while I was trying to sell it.  And that was not successful because the argument was made that the bankruptcy of Terri Steffen does not stop the litigation with a subsidiary company.  I believe that was the same argument made in this court too when your client tried to get an injunction from this Court to stop that lawsuit.

Q    Ms. Steffen gave an affidavit to Mr. Hammer and his clients in that lawsuit.  Are you familiar with that?

72

A    Yes.

Q    Did she -- did you have any conversations with her about the content of that affidavit?

THE COURT:  Does that reflect on any of these claims?

MR. HODGES:  Pardon?

THE COURT:  Her affidavit reflects anything relevant to the three claims involved here?

MR. HAMMER:  Yes, Your Honor.

THE COURT:  It is?

MR. HAMMER:  Yes.  The affidavit is the affidavit in which she confesses to these claims.

THE COURT:  Okay.  Go ahead.

BY MR. HODGES:

Q    Did she -- did you have any conversations with her at all?

A    No.  I don't have --

THE COURT:  You did not.

THE WITNESS:  I never had a conversation with --

THE COURT:  You did not.

THE WITNESS:  But she sent me a letter saying that my son wanted to take my deposition but in lieu of taking a deposition I'm going to give him this affidavit unless you've got some other instructions for

me.  And she laid out various scenarios, do this or this or this or this, and I did not respond to it.

THE COURT:  That's it.  Anything else from him?

MR. HODGES:  One moment, Your Honor.

THE COURT:  Go ahead.

BY MR. HODGES:

Q    You talked earlier about the Bilzerian camp and the Haire camp.  Did the Bilzerian camp attempt to force you to sell Bicoastal to them prior to filing the Haircut lawsuit?

A    They made offers.  I wouldn't say they -- they didn't attempt to force me but they made offers.

Q    Didn't they file motions in this Court --

A    Yes.

Q    -- to try to force you to sell the assets?

MR. HAMMER:  Objection.  Relevance.

THE COURT:  What does the sale have to do with anything?

MR. HODGES:  The Haircut lawsuit is simply --

THE COURT:  What?

MR. HODGES:  Your Honor, we maintain the Haircut lawsuit is simply a collusive effort among all these people to gain control of Bicoastal.

THE COURT:  That is not pled.  You challenged

74

these claims on the basis they do not -- they are subject to bona fide dispute therefore the petitioning creditor is ineligible to maintain the lawsuit. Period.

MR. HODGES:  This is part of the dispute, Your Honor --

THE COURT:  Yes.

MR. HODGES:  -- is that -- it's all collusive.

THE COURT:  It doesn't say that.

MR. HODGES:  It is all-collusive.  And it does say that in the motion, Your Honor.

THE COURT:  I have to be a sculptor to figure that out.

MR. HODGES:  That is why it is subject to dispute, as Mr. Menchise just testified.

THE COURT:  That's not pled.

MR. HODGES:  It is pled.  It's in the motion.

THE COURT:  Let me see.  Here we are.

MR. HODGES:  Page 2 of my motion.  "In other words" --

THE COURT:  Page 2?

MR. HODGES:  Yes.  "In other words" --

THE COURT:  Hold it, hold it, hold it.

MR. HODGES:  All right.

75

THE COURT:  Yes.  Correct.  Okay.  That's pled.  All right.

MR. HODGES:  And it only sprang up when Mr. Menchise refused to sell --

THE COURT:  No, no, no.  What he just found out is not relevant.  Come on.  Focus the attention on the pleading, as filed.  Period.  And this is all self-explanatory.  I know what happened here.  You came to the conclusion that the involuntary case was for a twofold purpose, the lawsuit?

THE WITNESS:  Yes.

THE COURT:  Which is what and based on what basis?

THE WITNESS:  Based upon the --

THE COURT:  The son is suing the mother.  And the mother confesses it.  All right?

THE WITNESS:  Yeah.  It was a friendly lawsuit.

THE COURT:  Yeah.

THE WITNESS:  There was no --

THE COURT:  It's obvious.  They're speaking to each other I'm pretty sure.

THE WITNESS:  It didn't comply with the -- it just didn't have the documentation, didn't have the contract, there were offers made to purchase this asset

from me.  There was state court litigation going on between the parties that they were rushing to judgments.  Mr. Hammer was trying to get a summary judgment prior to Mr. Haire trying to get a summary judgment in other state court cases.

Nobody wanted to slow down and try to -- I even filed a motion for mediation which was, I guess, never heard.  But it just -- it seemed like there was an attempt made to get a heads up on the upcoming sale of the stock because I had come to court twice seeking -- and I never go to court to ask for permission to auction and seek bid procedures.  But in this case I thought it was prudent to do that.

So I came in front of the Court for bid procedures.  There were problems in getting documentation to support the value and the extent of the assets of Bicoastal.  This Court had to enter an order telling them to turn over certain documentation so that they can establish -- we could establish what the value and what the assets of Bicoastal were.  At the same time they were rushing trying to get a judgment, motion for summary judgment.  Wouldn't wait. Tried to schedule it immediately upon the filing of the amended complaint.

On the other hand, you had Mr. Haire's

77

counsel in another lawsuit filing motions for summary judgment in related litigation trying to claim a partnership interest between Bicoastal and OHLP so that they could attach the $2.8 million against OHLP to Bicoastal.  This is while I was trying to sell the asset.  And so it appeared to be, you know, jockeying for position to try to load this company up with debt prior to the sale.  And that's why -- you know, that was part of the reason why I say it didn't pass the smell test.

THE COURT:  All right.

MR. MENCHISE:  Plus the technical requirements of not having a contract, the discovery was redacted.  I know there were several cases going on and I didn't know if they were trying to pad the bill for this case versus another case.  There was --

THE COURT:  The auction was held --

MR. MENCHISE:  The auction was held.

THE COURT:  -- in conformity with the order?

MR. MENCHISE:  Yes, in conformance with the order.

THE COURT:  And the bidders participated in it?

MR. MENCHISE:  Yes.  It was participated by Mr. Hodges on behalf of, I believe the Family Trust of

78

Haire; Mr. Haire there personally on behalf of himself; and Mr. Hammer was there.  Now originally Mr. Hammer sent me the $5,000 down payment, didn't identify who his client was, so I didn't know if it was Ms. Steffen or Haircut.

And then we had the auction.  He bid.  And I believe he was bidding on behalf of Haircut.  He was not the successful bidder.  He bid, I believe, $12,000.  It's attached to a report I filed.  The winning bid was $18,000.  There had been a prior offer made by Mr. Hammer on behalf of some other entity called the Bicoastal Acquisition Company or something for 25,000 but it was involving two companies, Bicoastal and OHLP.

I didn't want to sell OHLP because of the litigation that I have filed and plan to file against OHLP as an alter ego of Terri Steffen.  So I wanted to separate -- in fact, I asked this Court -- the Court ordered that it be separated.  And we just sold Bicoastal.

THE COURT:  All right.  Okay.  Anything else?

MR. HODGES:  I have nothing further for this witness.

THE COURT:  Thank you.  Mr. Hammer?

MR. HAMMER:  Your Honor, before I proceed, in an effort not to waste the Court's time --

79

THE COURT:  That's appreciated.

MR. HAMMER:  -- I would like to make a motion for a directed verdict in this evidentiary hearing.

THE COURT:  Considered and denied.

MR. HAMMER:  Okay.

THE COURT:  Okay.  Thank you.  The motion is considered and it is denied.  Proceed.

MR. HAMMER:  Thank you, Your Honor.

THE COURT:  Besides, we're still on their case but that's all right.  Okay.  Go ahead.  Cross-examination of Mr. Menchise.

MR. HAMMER:  May I approach, Your Honor?

THE COURT:  Sure.

**CROSS-EXAMINATION**

BY MR. HAMMER:

Q    Mr. Menchise, are you familiar with the documents I have placed in front of you?

A    This is the first time I've seen them but it appears to be a receipt from the Department of Revenue for the doc stamps on the note.

MR. HODGES:  Objection, Your Honor.

THE COURT:  What?

MR. HODGES:  Hearsay.

THE COURT:  What hearsay?  It's a public document.  He doesn't know it but you've seen it?  A

80

public document is admissible if proper predicate is laid.

MR. HODGES:  It is, Your Honor, but it doesn't indicate what it's for.

THE COURT:  What?

MR. HODGES:  It doesn't indicate what it's for.

THE COURT:  Let me see.  It's indicating a total payment of eighty-seven thirty-five and thirty-four dollars but it doesn't say for what.

MR. HAMMER:  Your Honor, the Florida Department of Revenue doesn't give documents the --

THE COURT:  This doesn't say.  It could be anything.

MR. HAMMER:  This is all the Florida Department of Revenue will give you.

THE COURT:  That's all right.  That somebody had something.

MR. HAMMER:  And, Your Honor, if I may, I'll proffer my own testimony.  I can get up -- I can get back up -- I was the one --

THE COURT:  Mr. Menchise hasn't seen it, he doesn't know anything about it.

MR. HAMMER:  Okay.

BY MR. HAMMER:

81

Q    Mr. Menchise, are these the form of documents that you would expect to see which would show the payment of documentary stamps?

A    I'm not sure.  I'm not familiar with this form.

Q    Mr. Menchise, are you aware of any fact that would present a basis for a bona fide dispute of the debt owed from Bicoastal Holding Company to Caligula Corporation, as assigned to Haircut Partners, LLLP?

A    No.  I don't have any facts.  I didn't get that far.

Q    Mr. Menchise, are you aware of any fact which would form the basis of a bona fide dispute of the claim of David E. Hammer, P.A. against Bicoastal Holding Company as David E. Hammer, P.A. assigned it to Haircut Partners, LLLP?

A    No.  Once again, I didn't get that far.  After I made the motion to compel and you turned over the documents, the Court at the very same hearing basically stayed everything so I didn't look into that any further.

Q    And are you aware of any fact which would form the basis for a bona fide dispute of the debt owing from Bicoastal Holding Company to the Bleakley Law Firm as the Bleakley Law Firm assigned it to Haircut Partners, LLLP?

A    No.  Same answer.  I did not get that far.

Q    Mr. Menchise, do you recall on February 15th, 2008 Ms. Steffen produced about 1200 pages of documents to you in

82

her bankruptcy case?

A    If it was in conjunction with the 341, yes.  I remember three different document productions.  And that was one of the reasons why the 341 had to be continued so many times.

Q    And do you recall that at one of those document productions, I believe it's the first one, bank statements for Bicoastal Holding Company were produced to you?

A    I believe you're correct.

MR. HAMMER:  May I approach, Your Honor?

THE COURT:  Yes.  This thing is not offered in evidence yet, so I don't know what we're going to do with it.

BY MR. HAMMER:

Q    Mr. Menchise, I've just handed you two documents. Would you please describe those documents?

A    It's a photocopy of a -- it says, "Deposit accounts, business economy checking, Bicoastal Holding Company, page 2 of 4, November 1, 2007 through November 30, 2007."  And it goes on.

Q    The page that you were just describing, do you recognize this as page 2 of a four-page bank statement for the period ending November 30, 2007 for the business economy checking account for Bicoastal Holding Company, account number ending in 0238?

83

A    That's what it says but, you know, I don't recognize this for that.

Q    Do you have any reason --

A    That's what it says.

Q    Do you have any reason to believe that this is not a copy of that document as I just described it to you, Mr. Menchise?

A    No.

Q    Mr. Menchise, if you would please read from the section entitled "deposits and credits."

A    Okay.

Q    It says --

THE COURT:  It's going to be offered in evidence?

MR. HAMMER:  Yes, Your Honor.  At this point I'll offer this document into evidence, the November 2007 statement.

MR. HODGES:  We object, Your Honor.

THE COURT:  Improper predicate for it.  The bank would be the best person.  He can't do it.

MR. HAMMER:  Well, I would like Mr. Menchise to authenticate it.  This is a statement that he received.

THE WITNESS:  I don't know that.

THE COURT:  It proves that he received it.

84

Where it comes from, he doesn't know.

MR. HAMMER: That's correct, Your Honor. But what we're talking about here is whether Mr. Menchise had any basis to contest --

THE COURT: Yes.

MR. HAMMER: -- the debt to Caligula. And the receipt of this bank statement would negate any basis to contest that. This shows the receipt of the funds.

THE COURT: It doesn't -- no. You want to prove the veracity of the document which cannot be established by his testimony or by this piece of paper. All he can say is he received this thing and based on that he formulated the idea that there was no advancement of funds, I guess.

BY MR. HAMMER:

Q   Mr. Menchise, in your review of --

THE COURT: That should be authenticated by the holder of the records, the bank people, not him. He doesn't know nothing about it.

MR. HAMMER: Fair enough.

BY MR. HAMMER:

Q   Mr. Menchise, in your receipt and review of the Bicoastal Holding Company bank statements, which you've previously testified were produced to you, did you identify

85

whether or not any funds had been received from Caligula

Corporation to Bicoastal Holding Company on or about the

dates of the two notes in September and November of 2007

respectively?

A    No, I didn't.  And it was never pointed out to me

otherwise.

Q    Did you reach any conclusion that those funds were

not received?

A    No.

THE COURT:  Either way.

THE WITNESS:  No.  I said I was trying to

substantiate that.  That's why I had requested the

documents be produced.  No, I didn't reach any

conclusion that they were or they weren't.  I noticed

that there were no doc stamps which is a condition

precedent to maintaining an action, filed the motion to

dismiss as you remember, said without -- I had without

knowledge essentially of the allegations.  And that's

why I sought to do discovery.  And it was never pointed

out to me that these funds were ever received.

And you add that to the fact that it was the

son, you know, borrowing money from the mother and a

different corporation and it just -- it was unusual.

BY MR. HAMMER:

Q    Mr. Menchise, how long have you been a bankruptcy

86

trustee?

A     Seventeen years.

Q     Is the sole fact that a creditor and a debtor are mother and son, or corporations owned by mother and son, is that fact alone a legitimate basis for a bona fide dispute to disqualify a creditor under 303(b), in your experience in 17 years?

A     Let's put it this way.  Inside transactions are reviewed very, very thoroughly in bankruptcy, especially by a trustee.  Whenever I see loans from a mother to a father or payment from a family member to another family member or a security agreement from one family to another family, we look -- I try to look at those very thoroughly.

Q     And isn't it true that the reason that you review transfers between insiders is because there's an extended period of avoidance for preferences paid to insiders?

A     That's one of them.

        THE COURT:  Only that reason?

        THE WITNESS:  That's one of them.

        THE COURT:  Sure.  To begin with, it's a red flag, documentation of a creditor relationship between son and daughter.  To begin with.

        THE WITNESS:  And that's exactly what my position was in this case.  That's why I have done discovery, tried to get these documents, tried to

87

determine whether or not this money was owed, in fact.

As I told you, if this money was really owed, I wasn't out to try to see that nobody got their fees. They just had to show that these -- this was actually due and owing.

BY MR. HAMMER:

Q    At the hearing in the Haircut vs. Bicoastal case where you just testified earlier that Terri Steffen offered documents to you, to hand you, are you aware of what the documents were that Terri Steffen was going to hand you or attempting to hand you?

A    They were in a sealed envelope and it appears the same sealed envelope that you gave me at the court hearing. In fact, as I recall I said you want to give me the documents and you said something like I'll give them to you in Bankruptcy Court.  And then you -- I believe you did and those are the documents that I brought with me.

Q    And do you recall ever telling Terri Steffen that when she tried to hand you documents that she needed to give them to you through her then-only counsel at the time Edward Peterson because I had not yet appeared in the Steffen case?

A    No.  No.  I told her to give them to her lawyer to give them to me, which I assume was you because you were the only one there.  And I did that because I didn't want to encourage Ms. Steffen from contacting me directly like she

88

attempts to do.  And I had told Mr. Peterson and I believe I had told you to please have your client contact you to contact me rather than go to me directly.

And I didn't see why she would be giving me the documents if you were representing her.  And if you remember, when we went into court the judge asked you:  Are you adopting this amended complaint.  Because one of the concerns that the Court had that I had was that Haircut was being represented by a non-attorney.  And the judge did his own research and said that was improper and that was one of my motions -- grounds for my motion to dismiss.  And you said that, yes, you were in the case and you were adopting the amended complaint.

So, I thought it was unusual that she would be giving the documents as opposed to you.

Q    And, Mr. Menchise, in your ultimate review of the documents that were produced to you, did you find any evidence whatsoever that any of the claims asserted by Haircut against Bicoastal were not valid?

A    Once the judge stayed the case I did not spend any time reviewing those documents because the case had been stayed pending a decision from the District Court.

MR. HAMMER:  I have nothing further.

THE COURT:  All right.  Thank you.  All right.  Yes, sir?

89

MR. HODGES:  One or two on redirect?

THE COURT:  Go ahead.

**REDIRECT EXAMINATION**

BY MR. HODGES:

Q    Mr. Menchise, do you believe the relationships among the parties, Haircut, Bicoastal, Caligula, Dan Bilzerian, Terri Steffen, Mr. Hammer, Mr. Bleakley, do you believe those relationships are sufficient to call into question the validity of these claimed debts?

A    Yes.

Q    That's based on your 17 years experience as a bankruptcy trustee?

A    Right.  Right.  Because they're called insiders.

Q    And is that why you tried to substantiate the debt?

A    Yes.

Q    And could not?

A    I didn't have to because the Court stayed it.  And so I did not do any more discovery once the state court stayed the action, pending a decision from the D.C. court.

Q    But up until then you could not; is that correct?

A    That's correct.  I'll also add that it was going very, very quick.  I mean you're talking about weeks.  I can remember that coming back from the hearing on the motion to dismiss and Mr. Hammer was trying to set motions for summary

90

judgment within a matter of weeks, even before I got back to my office.  And so it was going very, very quick which is another indication to me that, you know, it's just not the ordinary, usual arm's length type of transaction.

MR. HODGES:  I have nothing further.

THE COURT:  All right.  Thank you.  Okay.  Thank you.  Next?

* * * * *

(Whereupon, Mr. Hammer called and examined Mr. Haire.)

* * * * *

MR. HAMMER:  Your Honor, very briefly I would like to testify in my case in rebuttal.

THE COURT:  Go ahead.

THE REPORTER:  He's still under oath?

THE COURT:  Still sworn in, yes.

**R E B U T T A L**

Whereupon,

**DAVID HAMMER**

called himself as a witness and, having been previously duly sworn to tell the truth, testified herein.

**DIRECT EXAMINATION**

MR. HAMMER:  I'm here to testify about the documents which I've distributed to the parties from the Florida Department of Revenue.

91

On September 18th, 2008, in response to Mr. Menchise's allegations that the Caligula notes were not valid, Caligula retained me to go to the Florida Department of Revenue office in Tampa on Martin Luther King, Jr. Boulevard and pay the documentary stamps on the promissory notes on which this debt is based in part in the amount in excess of $15,000.

The documents that I'm referring to are entitled "Payment receipt, taxpayer copy," from the Florida Department of Revenue dated September 18, 2008. The period -- if you look further down on the document where it says what the documentary stamp tax is applied to, for the first document, it says, "Period 09/2007." That is because --

THE COURT:  What is it?

MR. HAMMER:  I'm looking here at the receipt number ending in 5, "921762345," the payment receipt from the Florida Department of Revenue.

THE COURT:  Applied to code -- hmm.  The only dates are September 18th, receipt number 921762347.

MR. HAMMER:  Okay.  We can look at that document first.  I gave you two documents which look very similar.

THE COURT:  Correct.  The other one is 921762345.

92

MR. HAMMER:  Okay.  Let's start with that one, 921762345.

THE COURT:  All right.

MR. HAMMER:  Okay.  If you look further down the page it shows that $77.35 was paid as a documentary stamp tax and it was paid for the period of September 2007.  The reason that the period of September 2007 shows here is because I handed to the revenue agent at the Florida Department of Revenue the note from Bicoastal Holding Company to Caligula Corporation in the amount of $10,000 dated in September 2007.

The revenue agent then determined that the proper amount of documentary stamp tax on that note was $77.35.  I paid that amount in cash on behalf of Caligula Corporation and was issued this receipt.

THE COURT:  A year after the note was executed.

MR. HAMMER:  Yes, Your Honor.  It was -- based upon the legal research that I did for Caligula -- for Haircut and Caligula, it can be any time prior to a judgment.  That is what state law provides for in Florida.

Similarly, if you look at receipt number 921762347, the other page, you see a documentary stamp tax paid for $34.83.  And this is the documentary stamp

93

tax that was paid for the period in November 2007. That is for the $5,000 promissory note which was dated November 2007, which when I presented it to the revenue agent at the Florida Department of Revenue the revenue agent determined that the proper amount of documentary stamp tax was $34.83 and issued me this receipt which I have provided to the Court and offer into evidence at this time.

THE COURT:  How about it?

MR. HODGES:  I believe it makes the -- I believe his testimony makes the documents admissible. I do have questions about it.

THE COURT:  Yes.  What would be the number, your exhibit number?

MR. HAMMER:  Oh.

THE COURT:  It's the only one you have; right?

MR. HAMMER:  Yes, Your Honor, it is the only one.

THE COURT:  Exhibit No. 1 and 2.

MR. HAMMER:  You can assign whatever number --

THE COURT:  1 and 2.

MR. HAMMER:  Sure.

THE COURT:  Thank you.

94

MR. HAMMER:  We will make Exhibit 1 receipt number 921762345 --

THE COURT:  Yes.

MR. HAMMER:  -- and Exhibit 2, 921762347.

THE COURT:  Okay.  Thank you.  Okay.

**(Whereupon, Petitioning Creditor's Exhibits 1 and 2 were marked for identification and admitted into evidence.)**

THE COURT:  That's it?

MR. HAMMER:  Yes.  That is all I have on direct.

THE COURT:  Thank you.  Okay.  Thank you. This concludes the presentation --

MR. HODGES:  Can I cross?

THE COURT:  What?

MR. HODGES:  Can I cross on the documents?

THE COURT:  Oh, yeah.  Go ahead.

**CROSS-EXAMINATION**

BY MR. HODGES:

Q    Mr. Hammer, do you know what the basis of documentary stamp tax is in Florida on promissory notes?

A    When you say the "basis," the "basis" is Florida Statutes.

Q    How it's calculated?

A    Not off the top of my head, no, I don't.

95

Q    Does 35 cents per hundred dollars sound right?

A    I wouldn't be surprised if I opened up a Florida Statutes book and that's what it says but I'm not going to testify that that's what it is without looking at a Florida Statutes book.

Q    Okay.  Does that sound right to you is my question.

A    Sure.  It sounds right to me.

Q    Okay.  All right.  One of the notes if $5,000, one of them is $10,000?

A    Yes.

Q    Shouldn't these -- shouldn't one of these receipts be exactly double the other?

A    No.

Q    Why?

A    It just occurred to me how documentary stamp tax is calculated.  And, Your Honor, if you would like I can brief the Court on this issue.  But it's calculated by period for the amount -- there is actually a fee for the amount of time that it has been owing.  So, in other words, the September 2007 tax that has been owing since September 2007, because the tax becomes due and owing when the note is made, that has been due and owing for two months longer than the tax on the $5,000 note which has been only due and owing since November 2007.  So, that is why one amount is not

96

exactly double the other.

I don't recall the exact way that you calculate Florida documentary stamp taxes from the top of my head, but I'm happy to brief the Court on this issue and I can submit a brief on that in 24 hours.

Q    Isn't it a 5 percent penalty per month?

A    I don't -- I don't know off the top of my head, Mr. Hodges.

Q    You're a tax lawyer, Mr. Hammer?

A    I have a Master in Laws in Taxation, Mr. Hodges. I prepared the documentary stamp tax return, I computed these amounts and I'm happy to brief the Court on the manner in which those amounts were computed.

THE COURT:  No.  You don't have to brief it.

MR. HODGES:  All right.  Thank you.

THE COURT:  Okay.  Thank you.

(Whereupon, this completed the requested excerpt.)

97

CERTIFICATE OF REPORTER

STATE OF FLORIDA          )

COUNTY OF HILLSBOROUGH  )

        I, Kimberley S. Johnson, Official Court Reporter, certify that I was authorized to and did report by use of Stenomask the foregoing proceedings in the United States Bankruptcy Court, Middle District of Florida, Tampa Division, before the Honorable Alexander L. Paskay, in the above-captioned case at the time and place set forth, and that the foregoing pages constitute a true and correct transcription to the best of my ability.

        WITNESS MY HAND this 12th day of March, 2009, at Tampa, Hillsborough County, Florida.


_____
Kimberley S. Johnson, CVR
Certified Verbatim Reporter
Notary Commission No. DD449281
Commission Expiration: 8/29/09